**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| HOFFMANNN BROTHERS HEATING AND AIR CONDITIONING, LLC, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| HOFFMANN AIR CONDITIONING AND HEATING, LLC,  et al., | ) |
| | )  Case No. 4:19-cv-00200-SEP |
| Defendants, | ) |
| | ) |
| v. | ) |
| | ) |
| HOFFMANNN BROTHERS HEATING AND AIR CONDITIONING, INC., ROBERT J. HOFFMANNN, CHRIS HOFFMANNN, AND ROBERT JOSEPH HOFFMANNN, JR. | ) |
| | ) |
| Counterclaim Defendants. | ) |

## MEMORANDUM AND ORDER

Before the Court are Plaintiff's Motion for Judgment as a Matter of Law, or alternatively, Motion for New Trial, Defendants' Motion for Confirmation from the Court Regarding Preliminary Injunctive Relief, and multiple motions for bills of costs.  Docs. [467], [474], [490], [493], [494], [495].  The motions have been fully briefed.  For the reasons set forth below, Plaintiff's and Counterclaim Defendants' motions are denied and Defendants' motions are granted.

### BACKGROUND

This matter comes before the Court after more than a decade of litigation among the parties.  In 1988, Defendant Thomas E. Hoffmann (Tom), and his older brother, Counterclaim Defendant Robert Hoffmann (Robert), along with their father, purchased what would eventually

become Hoffmann Brothers Heating and Air Conditioning, Inc.[1]  Doc. [252] at 2.  In 2010, Robert made plans to buy Tom out of the family business, Doc. [278] ¶ 1 *SEALED*, and a lawsuit between the brothers ensued in the Circuit Court of St. Louis County.  *See* Doc. [285] ¶ 2.  On July 14, 2011, the parties entered into a Settlement Agreement.  *Id.*  The 2011 Settlement Agreement included, among other things, a non-disparagement clause, nonsolicitation agreements, stock payment provisions, the dismissal and release of claims involved in the previous lawsuit, and a provision that provided for Tom to receive a payment in exchange for his agreement to not use the "Hoffmann" name in connection with an HVAC business for the four years following the settlement.  *See* Doc. [251-2] *SEALED* (Copy of the 2011 Settlement Agreement).

After executing the Settlement Agreement, Tom created a new HVAC company, operating under the name "Engineered Solutions."  *See* Doc. [59] ¶ 22.  In the summer of 2017, Tom began using the business name "Hoffmann Air Conditioning & Heating" (Hoffmann AC) and operating the website hoffmannairconditioning.com.  *Id.* ¶ 23.  Soon after Tom began operating with the Hoffmann name, Robert emailed counsel to determine whether Hoffmann Brothers had any recourse against Tom changing his business name and advertising the new name on his website and social media accounts.  Doc. [278] ¶ 11 *SEALED*.  On January 25, 2019, Plaintiff's counsel sent a Cease & Desist letter to Tom, demanding that Tom stop using the word "Hoffmann" in conjunction with his HVAC business.  Doc. [285] ¶ 9.  Shortly thereafter, on February 8, 2019, Plaintiff Hoffmann Brothers filed this suit against Defendants Tom Hoffmann and Hoffmann AC, bringing seven counts alleging various claims relating to trademark and copyright infringement, cyberpiracy, and breach of contract.  *See* Doc. [1] (Complaint); Doc. [55] (Second Amended Complaint).  Defendants later filed counterclaims against Plaintiff Hoffmann Brothers as well as Robert J. Hoffmann, Robert J. Hoffmann Jr. (Joe), and Chris Hoffmann (Counterclaim Defendants).  Doc. [59].  After Defendants filed a motion for summary judgment, Plaintiff voluntarily dismissed its cyberpiracy claim with prejudice.  *See* Doc. [276] at 16.  At summary judgment, Defendants prevailed on Plaintiff's claims for

---

[1] Prior to becoming Hoffmann Brothers, Inc., the company was also known as Hoffmann-Linton.  Doc. [59] (Answer to Complaint) ¶ 10.  Although the parties dispute the exact date in which Hoffmann Brothers was used as the exclusive name of the company, it occurred at some point between 2001 and 2003.  *Id.*

copyright infringement (Count 1) and dilution (Count 5). *See* Doc. [362]. Plaintiff prevailed on Count II of Defendants' counterclaim for breach of contract, and Counterclaim Defendants prevailed on Defendants' counterclaims for defamation and tortious interference. *Id*. The parties proceeded to trial on Plaintiff's remaining trademark-related claims, its breach of contract claims, and Defendants' claim for prima facie tort against Joe Hoffmann.

On June 17, 2022, after an eight-day trial, the jury found in favor of Defendants on Plaintiff's primary claims of trademark infringement and unfair competition. *See* Doc. [460]. The jury found that Defendants had a good faith belief that they were entitled to use the mark Hoffmann Air Conditioning & Heating. *See* Doc. [460-1] at 4. The jury also found that Defendants did not intentionally set out to deceive or confuse consumers in order to trade on the goodwill or reputation of the Hoffmann Brothers mark. *Id*. at 3. The jury further found in favor of Defendants on their counterclaim of prima facie tort against Counterclaim Defendant Joe Hoffmann, awarding $800 in actual damages and $5,000 in punitive damages. *Id*. For Plaintiff's two breach of contract claims against Tom, the jury found in favor of Tom on Plaintiff's claim that Tom breached the 2011 Settlement Agreement by using the name "Hoffmann" in an HVAC business name between 2011 and 2015, and found in favor of Plaintiff on its claim that Tom had breached the 2011 Settlement Agreement by failing to return or destroy all Hoffmann Brothers materials in his possession, but awarded only nominal damages of $1 to Plaintiff for the breach. *See* Doc. [460]. Finally, the jury found in favor of Counterclaim Defendant Robert Hoffmann on Tom Hoffmann's breach of contract claim against him. *Id*.

In addition to Plaintiff's post-trial motions, Defendants now request relief from certain self-imposed injunctions entered into throughout the course of this litigation. In the early days of this litigation, Plaintiff Hoffmann Brothers filed a motion for preliminary injunction, followed by an amended motion for preliminary injunction, both of which were based on its trademark claims. *See* Docs. [16]; [153]. Before the Court issued a decision on Plaintiff's requests for a preliminary injunction, the parties entered into two joint agreements wherein Defendants agreed to abide by the restrictions sought in the injunction, and that were to remain in effect until "final disposition of this case." Docs. [149] at 2; [173] at 2. Defendants maintain that when the jury found in their favor on Plaintiff's trademark infringement claims, that constituted "final

disposition" of the claims, and now ask the Court to find that they are no longer bound by the restrictions imposed under the joint agreements.  Doc. [467].

LEGAL STANDARD

Rule 50 of the Federal Rules of Civil Procedure states that, when ruling on a renewed motion for judgment as a matter of law, "the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." Fed. R. Civ. P. 50(a)-(b).

In ruling on a motion under Rule 50, a court must draw all reasonable inferences in favor of the nonmoving party.  *Roberson v. AFC Enters., Inc.*, 602 F.3d 931, 933 (8th Cir. 2010); *Canny v. Dr. Pepper/Seven–Up Bottling Grp., Inc.*, 439 F.3d 894, 900 (8th Cir. 2006).  A court must deny a motion for judgment as a matter of law if it concludes that reasonable jurors could draw different conclusions based on the evidence.  *Roberson*, 602 F.3d at 933.  A court must also "give the prevailing party the benefit of all favorable inferences which may reasonably be drawn from the facts." *Neely v. Am. Family Mut. Ins. Co.*, 930 F. Supp. 360, 368 (N.D. Iowa 1996) (quoting *Minneapolis Cmty. Dev. Agency v. Lake Calhoun Assocs.*, 928 F.2d 299, 301 (8th Cir. 1991)).  In other words, a court ruling on a renewed motion for a judgment as a matter of law, must:

> (1) resolve direct factual conflicts in favor of the nonmovant, (2) assume as true all facts supporting the nonmovant which the evidence tended to prove, (3) give the nonmovant the benefit of all reasonable inferences, and (4) deny the motion if the evidence so viewed would allow reasonable jurors to differ as to the conclusions that could be drawn.

*Stults v. Am. Pop Corn Co.*, 815 F.3d 409, 418 (8th Cir. 2016) (quoting *Jones v. Edwards*, 770 F.2d 739, 740 (8th Cir. 1985)).  And in doing so, a court must "not make credibility determinations or weigh the evidence."  *Meyers v. Starke*, 420 F.3d 738, 741 (8th Cir. 2005).

The Eighth Circuit has stated that "[j]udgment as a matter of law is appropriate only when the record contains 'no proof beyond speculation to support the verdict.'"  *Am. Bank of St. Paul v. TD Bank, N.A.*, 713 F.3d 455, 462 (8th Cir. 2013) (quoting *Wilson v. Brinker Int'l, Inc.*, 382 F.3d 765, 770 (8th Cir. 2004)) (additional citations omitted); *see also Arabian Agric. Servs. Co. v. Chief Indus., Inc.*, 309 F.3d 479, 482 (8th Cir. 2002).  Put differently, judgment as a matter of law "is appropriate 'when all the evidence points one way and is susceptible of no reasonable inferences sustaining the position of the non-moving party.'" *Hortica–Florists' Mut. Ins. Co. v.*

4

*Pittman Nursery Corp.*, 729 F.3d 846, 854 (8th Cir. 2013) (quoting *Ehrhardt v. Penn Mut. Life Ins. Co.*, 21 F.3d 266, 269 (8th Cir. 1994)).  Still, "'[a] mere scintilla of evidence is inadequate to support a verdict' and judgment as a matter of law is appropriate when the record contains no proof beyond speculation to support the verdict."  *Clark v. Kan. City Mo. Sch. Dist.*, 375 F.3d 698, 701 (8th Cir. 2004) (quoting *Larson v. Miller*, 76 F.3d 1446, 1452 (8th Cir. 1996)).

Federal Rule of Civil Procedure 59(a)(1)(A) states that a court may grant a motion for a new trial after a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  A new trial is appropriate if there is a "clear showing that the outcome is against the great weight of the evidence so as to constitute a miscarriage of justice." *Weitz Co. v. MH Wash.*, 631 F.3d 510, 520 (8th Cir. 2011) (quoting *Foster v. Time Warner Entm't Co.*, 250 F.3d 1189, 1197 (8th Cir. 2001)).  When considering whether the outcome is against the great weight of evidence, "[a] district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in doing so evaluate for itself the credibility of the witnesses." *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980).  "A new trial is [also] appropriate when the first trial, through . . .  legal errors at trial, resulted in a miscarriage of justice."  *Gray v. Bicknell*, 86 F.3d 1472, 1480 (8th Cir. 1996).  Not every error requires granting a new trial; the "key question is whether a new trial should have been granted to avoid a miscarriage of justice."  *Bass v. Gen. Motors Corp.*, 150 F.3d 842, 845 (8th Cir. 1998).

In reviewing Rule 59 motions, unlike Rule 50 motions, "the trial court can rely on its own reading of the evidence—it can 'weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain a verdict.'" *Waitek v. Dalkon Shield Claimants Tr.*, 934 F. Supp. 1068, 1092 (N.D. Iowa 1996) (quoting *White v. Pence*, 961 F.2d 776, 780 (8th Cir. 1992)).  The decision to grant a new trial is "confided almost entirely to the exercise of discretion on the part of the trial court," *Champeau v. Fruehauf Corp.*, 814 F.2d 1271, 1274 (8th Cir. 1987).  But the Court "may not usurp the role of the jury by granting a new trial simply because it believes other inferences and conclusions are more reasonable" than those drawn by the jury.  *Rustenhaven v. Am. Airlines*, 320 F.3d 802, 805 (8th Cir. 2003).

The Eighth Circuit has succinctly described the standards, stating that a district court should grant a motion for judgment as a matter of law "only when all the evidence points one way and is susceptible of no reasonable inference sustaining the position of the nonmoving

party." *Warger v. Shauers*, 721 F.3d 606, 610 (8th Cir. 2013), *aff'd*, 574 U.S. 40 (2014) (quoting *Littleton v. McNeely*, 562 F.3d 880, 885 (8th Cir. 2009)).  "The standard for granting a new trial is even higher." *Id.* (citing *Howard v. Mo. Bone & Joint Ctr., Inc.*, 615 F3d 991, 995 (8th Cir. 2010) ("The standard for granting a motion for new trial is higher still . . . [and] [w]here the basis of the motion for a new trial is that the jury's verdict is against the weight of the evidence, the district's court's denial of the motion is virtually unassailable on appeal." (internal quotations omitted)).  Motions for a new trial "'are generally disfavored and will be granted only where a serious miscarriage of justice may have occurred.'" *Walmart Inc. v. Cukar Interactiv, LLC*, 949 F.3d 1101, 1113 (8th Cir. 2020) (quoting *Keller Farms, Inc. v. McGarity Flying Serv., LLC*, 944 F.3d 975, 984 (8th Cir. 2019)).

DISCUSSION

I. **The Court did not err in submitting to the jury Defendants' prima facie tort counterclaim.**

Plaintiff first argues that Defendants' prima facie tort counterclaim should not have been submitted to the jury, and alternatively, the jury's verdict for Defendants on the claim was against the weight of the evidence and a new trial should be granted.  Plaintiff offers five grounds on which the prima facie tort should not have been submitted to the jury: (1) Defendants' claim should have been brought as a different nominate tort; (2) there was insufficient evidence that Joe's actions were lawful; (3) Defendants' damages theory should have been excluded from trial; (4) Defendants failed to show substantial evidence of actual damages; and (5) there was insufficient evidence supporting a claim of punitive damages.  Doc. [475] at 3.  Plaintiff also argues that the tort claim "was the vehicle for introducing otherwise irrelevant, inflammatory evidence that prejudiced the jury against Hoffmann Brothers," which "poisoned the jury on Hoffmann Brothers' affirmative claims."  *Id*. at 3-4.  Defendants respond that Plaintiff's arguments have either been thoroughly considered and rightfully rejected by the Court or are now being raised for the first time and are waived.  Doc. [500] at 6.  The Court will address each of Plaintiff's five arguments in turn.

**A. Plaintiff waived its argument concerning other nominate torts.**

Plaintiff argues that Defendants' prima facie tort claim[2] should not have been submitted to the jury because Defendants "could have made a submissible claim for invasion of privacy" or "intentional infliction of emotional distress." Doc. [475] at 5. Plaintiff asserts that under Missouri law, a prima facie tort claim is not submissible if the defendant's actions could have constituted any nominative tort, citing *Bandag of Springfield, Inc., v. Bandag, Inc.*, 662 S.W.2d 546 (Mo. Ct. App. 1983). *Bandag* explains the difference between prima facie torts and nominate torts, noting that "conduct falling within a traditional category of tort is unlawful," whereas "prima facie tort applies only to conduct which would be lawful but for defendant's intent to injure the plaintiff." *Bandag*, 662 S.W.2d at 554. Thus, "if, at the close of all the evidence, plaintiff's proof warrants submission under an existing, well-defined nominate tort cause of action, the action may not be submitted under the prima facie tort doctrine." *Id.* at 552.

Defendants respond that the possibility that the evidence supporting their prima facie tort claim could have supported invasion of privacy or intentional infliction of emotional distress is only now being raised for the first time, and thus the argument is waived. The Court agrees. Federal Rule of Civil Procedure 50(a)(2) states that a motion for judgment as a matter of law must "specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment." Fed. R. Civ. P. 50(a)(2). "Adherence to the rule is mandatory." *Walsh v. Natl. Computer Sys., Inc.*, 332 F.3d 1150, 1158 (8th Cir. 2003) (citation omitted). "[T]echnical precision" is not required, but "the motion must be 'specific enough' to notify the district court and the opposing party of the underlying issue." *Hyundai Motor Fin. Co. v. McKay Motors I, LLC*, 574 F.3d 637, 642 (8th Cir. 2009) (citations omitted). Consequently, the Eighth Circuit has held a "post-trial motion for judgment may not advance additional grounds that were not raised in the pre-verdict motion." *Klingenberg v. Vulcan Ladder USA, LLC*, 936 F.3d 824, 834 (8th Cir. 2019) (quoting *Walsh v. Nat'l Comput. Sys., Inc.*, 332 F.3d 1150, 1158 (8th Cir. 2003)). That is, a "movant cannot use a Rule 50(b) motion 'as a vehicle to introduce a

---

[2] The elements of prima facie tort are (1) an intentional lawful act by the defendant; (2) with intent to cause injury to the plaintiff; (3) resulting in injury to the plaintiff; with (4) the absence of justification or insufficient justification for the defendant's act. *Bandag of Springfield, Inc. v. Bandag, Inc.*, 662 S.W.2d 546, 552 (Mo. Ct. App. 1983). Evidence was submitted at trial that Joe signed up for various websites, including Realtor.com and AutoTrader.com, using Tom's contact information, with the intent to inundate Tom with annoying spam solicitations, and that Tom received phone, text, and e-mail solicitations from those websites as a result. *See* Docs. [470] at 164-165; [482] at 274-281; [484] at 6-8.

legal theory not distinctly articulated in its close-of-evidence motion for a directed verdict.'"
*Id.* (citations omitted).

When Plaintiff brought its motion for judgment as a matter of law under Rule 50(a), it argued that the prima facie tort claim against Joe should have been brought as a false light invasion of privacy claim.  *See* Doc. [484] at 138-43; 150-53.  Plaintiff argued that registering Tom for solicitations without Tom's permission "would fall under an existing nominate tort and so should not be submitted to the jury as a prima facie tort claim."  *Id*. at 139:15-18; 152:10-14.  The Court asked for clarification as to the nominate tort at issue, asking:  'You're saying [Defendant's claim] could fall under false light invasion of privacy, and therefore, it's not appropriate for a prima facie tort claim?"  *Id*. at 139:15-23.  Counsel for Plaintiff replied, "Yes." *Id*. at 139:23.  In support, Plaintiff cited *Meyerkord v. Zipatoni Co*., 276 S.W.3d 319, 325 (Mo. Ct. App. 2008), in which the Missouri Court of Appeals first adopted false light tort as a separate remedy.  *Id*. at 151:21-22.  Plaintiff repeatedly and explicitly argued that the facts alleged in Tom's prima facie tort claim fell within the false light tort and never argued that the underlying facts could fall under the torts of intentional infliction of emotional distress or any kind of invasion of privacy other than false light.[3]  Docs. [484] at 139-41, 149, 150-52; [485] at 81-83. Despite ample opportunity, Plaintiff did not raise the arguments it now makes.[4]

The Court's oral ruling on Plaintiff's Rule 50 motion clearly manifests the understanding that Plaintiff's argument was that Tom's prima facie tort claim was not submissible because it should have been brought as a false light claim.  When denying the motion, the undersigned

---

[3] "[I]nvasion of privacy is a general term used to describe four different torts," including: (1) unreasonable intrusion on the seclusion of another; (2) appropriation of another's name or likeness; (3) unreasonable publicity given to another's private life; or (4) publicity that unreasonably places the other in a false light.  *See Meyerkord v. Zipatoni Co*., 276 S.W.3d 319, 322 (Mo. Ct. App. 2008).

[4] In fact, Plaintiff passed up many opportunities to raise this argument over the course of this lengthy litigation.  Its memorandum in support of its motion to dismiss Defendants' counterclaims did not address the prima facie tort claim.  *See* Doc. [77].  Plaintiff devoted one cursory paragraph of its summary judgment briefing to Tom's prima facie tort claim, arguing only (and unsuccessfully) that it had to be brought as a defamation claim.  *See* Doc. [255] at 15; Doc. [362] at 39.  Plaintiff and Counterclaim Defendants' trial briefs likewise contained only the barest mention of the prima facie tort claim, arguing only that Tom would be unable to prove damages.  *See* Doc [346] at 13; Doc. [378] at 14.  And Plaintiff's motions in limine raised arguments about damages and evidence in relation to the prima facie tort claim, but they did not address whether the claim was subsumed by other nominate torts.  *See* Doc. [429] at 2, 5.

stated, "I looked at the case law that you provided me with yesterday, *Meyerkord*[5] specifically, and it notes the . . . elements . . . publicity, false light, and highly offensive to a reasonable person, none of which is obviously applicable to what happened here.  [Tom's] name was given to third parties, but not in the way, not—he wasn't publicized . . . [and] [t]he highly offensive to a reasonable person aspect also does not seem to be met here.  So, I don't think that this particular claim for prima facie tort could have been brought as a false light invasion of privacy claim based on the information and cases . . . that have been provided to me."  Doc. [485] at 83:10-25; 84:1-5.

Plaintiff claims to have raised this argument with sufficient specificity to preserve it for post-trial consideration based on counsel's statement, during the second day of argument on this point, that false light is actually an "umbrella" tort that can encompass the tort of invasion of privacy.  *See* Doc. [506] at 7, citing Doc. [484] at 81.[6]  A single fleeting reference to invasion of privacy, after extensive argument devoted solely to the tort of false light, was not sufficient to put the Court or Defendants on notice that Plaintiff's objection implicated any nominate tort other than false light, particularly when Plaintiff was suggesting that invasion of privacy was a species of the tort that was already under discussion.[7]  On careful review of the record, the Court concludes that, if Plaintiff's Rule 50(a) motion could be interpreted as raising any possible nominate tort other than false light invasion of privacy—which the Court does not think it can—

---

[5] *Meyerkord* describes the elements of false light:

> Section 652(E) of the Restatement (Second) of Torts spells out the elements of the tort of false light invasion of privacy as follows:  One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Meyerkord*, 276 S.W.3d at 323.

[6] The pin cite provided by Plaintiff does not correspond to a discussion of the prima facie tort claim.  Based on its own search, the Court assumes Plaintiff intended to refer to Doc. [485] at 81:6-10.

[7] In fact, Plaintiff had it backwards.  The tort of false light is not an umbrella tort that encompasses invasion of privacy; rather, invasion of privacy is an umbrella tort that encompasses the tort of false light. *See Meyerkord v. Zipatoni Co.*, 276 S.W.3d 319, 322 (Mo. Ct. App. 2008) ("[I]nvasion of privacy is a general term used to describe four *different* torts," including:  (1) unreasonable intrusion on the seclusion of another; (2) appropriation of another's name or likeness; (3) unreasonable publicity given to another's private life; or (4) publicity that unreasonably places the other in a false light) (emphasis added).

it certainly was not "'specific enough' to notify the district court and the opposing party of the underlying issue." *Hyundai Motor Fin. Co.*, 574 F.3d at 642 (citations omitted).

Furthermore, if Plaintiff had raised its current argument in its Rule 50(a) motion, the Court would have rejected it. The evidence presented at trial (i.e., that Joe signed up for websites using Tom's contact information, intending to cause Tom to receive spam solicitations that would annoy him and interfere with his ability to use his phone, and that Tom did receive multiple spam calls, emails, and texts as a result) would not have made a submissible case for either alternative nominate tort Plaintiff now proposes: intentional infliction of emotional distress or intrusion on the seclusion of another.[8]

To state a claim for intentional infliction of emotional distress, a plaintiff must plead extreme and outrageous conduct by a defendant who intentionally or recklessly caused severe emotional distress that results in bodily harm. *See K.G. v. R.T.R.,* 918 S.W.2d 795, 799 (Mo. banc 1996). The conduct must be "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Warren v. Parrish*, 436 S.W.2d 670, 673 (Mo. 1969). Furthermore, the conduct must have been "intended only to cause extreme emotional distress to the victim." *K.G.*, 918 S.W.2d at 799. The evidence introduced at trial certainly suggested that Joe's conduct towards his uncle was boorish and puerile, but no reasonable factfinder could have found that signing his uncle up for websites was "beyond all possible bounds of decency" or "utterly intolerable in a civilized community." *Warren*, 436 S.W.2d at 673. And there was no evidence admitted that Tom suffered severe emotional distress resulting in bodily harm as a result.

Had Plaintiff made the argument that the prima facie tort claim should have been dismissed because the underlying facts make a submissible case for unreasonable intrusion upon the seclusion of another, that argument would likewise have failed. "To establish a claim for invasion of privacy based upon unreasonable intrusion upon seclusion, a plaintiff must establish '(1) the existence of a secret and private subject matter; (2) a right possessed by plaintiff to keep that subject matter private; and (3) the obtaining of information about the subject matter by

---

[8] Plaintiff argues vaguely that Tom's prima facie tort claim should have been brought under the tort of invasion of privacy. As explained above, the tort of invasion of privacy is a generic term that describes four separate and distinct nominate torts. *See Meyerkord v. Zipatoni Co.*, 276 S.W.3d 319, 322 (Mo. Ct. App. 2008). The Court assumes, from context and the cases cited, that Plaintiff is referring to the tort of unreasonable intrusion upon the seclusion of another. *See* Doc. [475] at 5.

defendant through some method objectionable to the reasonable' person." *Porters Bldg. Centers, Inc. v. Sprint Lumber*, 2017 WL 4413288, at *9 (W.D. Mo. Oct. 2, 2017) (quoting *Corcoran v. Sw. Bell Tel. Co.*, 572 S.W.2d 212, 215 (Mo. Ct. App. 1978) (citation omitted); *see also Ruzicka Elec. & Sons, Inc. v. Int'l Bhd. of Elec. Workers, Local 1, AFL-CIO*, 427 F.3d 511, 524 (8th Cir. 2005) (citing *Corcoran*, 572 S.W.2d at 215). The intrusion alleged must be "highly offensive to a reasonable person." *Sofka v. Thal*, 662 S.W.2d 502, 510 (Mo.1983) (citing Restatement (Second) of Torts § 652B). The Restatement explains:

> The invasion may be by physical intrusion into a place in which the plaintiff has secluded himself, as when the defendant forces his way into the plaintiff's room in a hotel or insists over the plaintiff's objection in entering his home. It may also be by the use of the defendant's senses, with or without mechanical aids, to oversee or overhear the plaintiff's private affairs, as by looking into his upstairs windows with binoculars or tapping his telephone wires. It may be by some other form of investigation or examination into his private concerns, as by opening his private and personal mail, searching his safe or his wallet.

Restatement (Second) of Torts § 652B cmt. b (1977).

The evidence adduced at trial in support of Tom's prima facie tort claim does not make a case for invasion of privacy by unreasonable intrusion upon seclusion because there was no evidence presented that Joe had obtained information about Tom by an objectionable method. Also, the alleged unreasonable intrusion must have been perpetrated *by* the defendant, and no evidence was admitted at trial that Joe personally called, texted, or emailed his uncle. *See Branhan v. Celadon Trucking Services, Inc.*, 744 N.E.2d 514, 524 (Ind. Ct. App. 2001) (where plaintiff's coworkers taunted plaintiff about an embarrassing photo, that intrusion could not be imputed to defendant, even though defendant took and shared the photo, because defendant did not personally participate in the allegedly intrusive taunting behavior). Finally, the Court already determined, when considering the false light tort, that there was insufficient evidence for a reasonable jury to find Joe's conduct to be highly offensive to a reasonable person, which is also an element of this tort. Doc. [485] at 84:1-5.

"[A]t the close of all the evidence, [Tom's] proof did not "warrant[ ] submission under [the] existing, well-defined nominate tort[s]" of intentional infliction of emotional distress or invasion of privacy by intrusion on seclusion." *Bandag*, 662 S.W.2d at 552. Thus, had Plaintiff timely objected on that basis (which it did not), the Court would have denied the motion. On the record in this case, Defendants' prima facie tort claim was properly submitted to the jury.

**B.  There was sufficient evidence that Joe's acts were lawful.**

As noted above, one element of prima facie tort is that a defendant's actions are otherwise lawful.  *See Bandag*, 662 S.W.2d at 552 (The first element of prima facie tort is "an intentional lawful act by the defendant."); *see id*. at 554 ("[C]onduct falling within a traditional category of tort is unlawful," whereas "prima facie tort applies only to conduct which would be lawful but for defendant's intent to injure the plaintiff.").  Plaintiff argues that Defendants "failed to adduce evidence that Joe's actions were lawful," and the claim should not have been submitted to the jury because there was a lack of "substantial evidence tending to prove *every element*" of the claim.  Doc. [475] at 6-7 (emphasis in original).  Defendants counter that there was sufficient evidence for a juror to decide whether Joe's actions were lawful, and the claim was properly submitted to the jury.

At the Rule 50 motion conference, Plaintiff cited Tom's testimony that he had called the police to report Joe's actions as evidence that Joe's action were unlawful.  Doc. [484] at 147:2-11.  The Court, in ruling on Plaintiff's motion, noted that while there was "not a lot" of direct evidence on the lawfulness of Joe's actions, there was enough to let the jury decide the issue.  *Id*. at 154:5-19.  Specifically with respect to the fact that Tom called the police, the undersigned noted that "a reasonable juror could see [that fact] as suggestive that Tom thought the conduct was illegal," but the fact that Joe was not taken into custody or charged under any criminal statute "might also be interpreted as evidence of lawfulness."  *Id*.  The Court concluded that "this is a jury question" that should be left in "the jury's capable hands."  *Id*.  The Court is not persuaded by Plaintiff's renewed argument that it was mistaken in that conclusion.

**C.  Defendants' damages theory was properly admitted.**

Plaintiff next argues that Defendants' damages theory should have been excluded from trial.  This is the fifth time that this particular issue has been the subject of motion practice before the Court.  *See* Docs. [400] (Motion in Limine); [431] (Emergency Motion for Pretrial Disclosure of Damages Information); [438] (Motion for Relief from Prejudice Due to Late-Disclosed Damages Theory); [484] at 154-55 (Rule 50 Motion Conference).

In its motion in limine on this issue, filed on May 27, 2022, Plaintiff argued that the Court should exclude all evidence related to "new or undisclosed damages theories" for Tom's prima facie tort claim.  Doc. [400] at 1.  Plaintiff argued that Defendants had only ever offered a damages theory based on counterclaims that were disposed of at summary judgment and had

never offered a damages theory that went only to the prima facie tort claim. *Id*. at 2-3. Plaintiff also argued that Defendants should not be allowed to present the damages report or testimony of their expert, Melissa Gragg, which was based on Defendants' counterclaims for defamation, disparagement, and harassment. *Id*. at 4-5. Plaintiff finally argued that Defendants should not be allowed to introduce any damages theories, evidence, or computations at trial on the prima facie tort claim. *Id*. at 9-10. Defendants, in their response, conceded that Ms. Gragg would be used only as a possible rebuttal witness. Doc. [415] at 1. Defendants opposed the motion to the extent that it sought to exclude testimony about financial damages they sustained from Joe posing as Tom on various websites and causing him to received spam calls. *Id*. Defendants argued that their damages with respect to the prima facie tort claim were timely explained and quantified in their interrogatory answers submitted to Plaintiff in 2021, as well as in deposition testimony given in May and June of 2019 and July of 2021, and in supplemental disclosures provided on August 6, 2021. *Id*. at 2. Defendants further argued that Tom, as the founder of his company, had "sufficient personal knowledge to testify as to the fact of damages and can reasonably estimate the revenue he lost while his cell phone was unusable" due to the proliferation of spam calls, and he was thus competent to provide a reasonable estimate of damages at trial. *Id*. at 3. Defendants finally argued that their Rule 26 disclosures had explained that their damages theory was based not only on Ms. Gragg's opinion, but also on interrogatory answers stating that damages were also based on Tom's deposition testimony about his phone being unavailable. Doc. [464] at 83:8-10; 18-25.

On June 4, 2022, the Court denied Plaintiff's motion in limine, stating that "[i]n light of Defendants' disclosure [of damages calculations] on August 6, 2021, . . . any failure to comply with Rule 26(a) [was] harmless: the disclosure occurred shortly after the end of fact discovery; the evidence cited was not a surprise or unduly complex; its introduction will not disrupt the trial; if it required further development by Plaintiff, Plaintiff had plenty of time to seek a remedy from the Court; and there is no evidence that Defendants acted in bad faith." Doc. [429] at 2.

In response to that ruling, Plaintiff immediately filed an Emergency Motion for Pretrial Disclosure of Damages Information, seeking additional information from Defendants regarding their damages theory. Doc. [431]. Plaintiff argued that Defendants must provide, with respect to the prima facie tort claim, a "computation of damages" with "a summary of how damages should be calculated" and a "summary of the evidence on which they intend to rely." *Id*. at 1. In a

written ruling that same day, the Court granted Plaintiff's motion, noting that Defendants were under a standing obligation under Federal Rule of Civil Procedure 26 to disclose or supplement the requested information as necessary, and ordered Defendants to disclose, by 5 PM on June 5, 2022, a "computation of damages and/or a summary of how damages should be calculated, and a summary of the evidence on which they intend to rely at trial." In compliance with that order, Defendants provided Plaintiff supporting exhibits for the damages theory, the demonstrative that Tom would reference during his testimony on damages, further explanation regarding damages calculations, and the underlying invoices they relied upon. *See* Doc. [444-1].

Plaintiff then filed a Motion for Relief from Prejudice Due to Late-Disclosed Damages Theory, in which it again asked the Court to exclude all evidence or testimony on damages for the prima facie tort claim, arguing that the information disclosed by Defendants had become "increasingly complex" and that it was not clear from where Defendants derived their figures. Doc. [438] The Court heard oral argument from the parties on June 9, 2022, at which they discussed the origins of Defendants' figures, and it was determined that the spreadsheets relied on by Defendants had been produced in discovery. *See* Doc. [480] at 3-33. Upon careful consideration of the issue, the Court denied Plaintiff's motion. Doc. [445].

Finally, Plaintiff again raised the issue in the Rule 50 motion conference, and the Court again found that the evidence of damages on the prima facie tort claim would be allowed to go to the jury. *See* Doc. [484] at 154:21-25 ("I acknowledge it is very unfortunate the way that damages have developed in this lawsuit given the length of the lawsuit and how quickly everyone has had to grapple with this information. However, I can't find that it is too speculative or . . . [that] a reasonable juror couldn't find that it could be determined with reasonable certainty. So, I'm not going to find that there's not sufficient evidence of actual damages based on the evidence that was presented.").

To summarize, Plaintiff has argued multiple times that it was prejudiced by Defendants' late disclosure of its damages theory, and the Court has consistently found that any prejudice to Plaintiff was not so great as to require exclusion of Defendants' damages evidence and that the evidence was not too speculative to go to the jury. Now, Plaintiff argues that it is entitled to judgment as a matter of law on this issue, because the evidence on damages was inadmissible and without it there was no other evidence to prove the damages element.

Plaintiff's arguments are the same as those previously raised before the undersigned, and the Court sees no reason to change its prior determination. The Court carefully considered all of Plaintiff's arguments on this issue both before and during trial, and again concludes that the admission of evidence on Defendants' damages theory was not erroneous. *See Gen. Indus. Corp. v. Hartz Mountain Corp.,* 810 F.2d 795, 808 (8th Cir. 1987) ("Admission of evidentiary matters is within the discretion of the trial court and will not be disturbed on appeal unless abuse of that discretion is shown."). Defendants' damages theory was supported by Tom's testimony, as well as the demonstrative and exhibits he referenced while testifying. To support his testimony, Tom relied on business records, including invoices and spreadsheets reflecting bank statements showing deposits, all of which had been disclosed to Plaintiff. *See* Doc. [484] at 6-18, 27-28; 53-61. Additionally, Plaintiff had ample opportunity, which it took, to cross-examine Tom on the issue. *See* Doc. [484] at 27-73. Because the evidence was admissible, the jury had "a legally sufficient evidentiary basis" to support its determination, and Plaintiff is not entitled to judgment as a matter of law on this issue. Fed. R. Civ. P. 50(a)(1).

### D. Defendants submitted sufficient evidence of actual damages.

Plaintiff argues in the alternative that, even if Defendants' damages theory was properly admitted, it was "utterly without evidentiary basis" and as a result, the jury's $800 compensatory damage award must be set aside. Doc. [475] at 11. At the Rule 50 conference, Plaintiff argued that Defendants had not presented sufficient evidence of actual damages, and the Court stated that "I can't find that it is too speculative or . . . that . . . a reasonable juror couldn't find that it could be determined with reasonable certainty. So, I'm not going to find that there's not sufficient evidence of actual damages based on the evidence that was presented." Doc. [484] at 155: 1-6. As noted above, Defendants presented evidence of actual damages resulting from the spam calls and texts to Tom's phone in the form of testimony from Tom, his employee Nick Hoffmann, and their supporting exhibits. *See* Docs. [482] at 274-279; [484] at 6-18, 27-28; 53-61. There was sufficient evidence presented for a reasonable jury to award Tom damages in the amount of $800.00. The Court will deny Plaintiff's motion on this point.

### E. Defendants submitted sufficient evidence supporting punitive damages.

The jury awarded $5,000 in punitive damages to Tom on the prima facie tort claim. Plaintiff argues that there was insufficient evidence for the court to submit the claim of punitive damages to the jury for its consideration. Plaintiff asserts that the only evidence presented on

15

Joe's intent was Joe's testimony that he was embarrassed by his actions, which was not sufficient to support the requisite culpable motive. Doc. [475] at 11-12.

"Whether there is sufficient evidence to support an award of punitive damages is a question of law." *Rhoden v. Missouri Delta Medical Center*, 621 S.W.3d 469, 477 (Mo. banc 2021) (quoting *Gilliland v. Mo. Athletic Club*, 273 S.W.3d 516, 520 (Mo. banc 2009)). Under Missouri law "[p]unitive damages require clear and convincing proof of a culpable mental state, either from a wanton, willful, or outrageous act or from reckless disregard for an act's consequences such that an evil motive may be inferred." *Diaz v. Autozoners, LLC*, 484 S.W.3d 64, 88 (Mo. Ct. App. W. Dist. 2015) (quotation omitted). The Court must "view the evidence and all reasonable inferences in the light most favorable to submissibility and . . . disregard all evidence and inferences which are adverse thereto." *Id.* at 528–29.

Viewing the evidence in the light most favorable to submissibility, Defendants made a submissible case for punitive damages. There was evidence at trial that Joe, during the relevant time period, felt a great deal of frustration towards his uncle, and engaged in various acts meant to annoy Tom. *See* Doc. [470] at 134:11-13; 136:21-22; 153:2-5; 165:2-4. For example, there was evidence that Joe engaged in what was referred to as a "slime campaign." *See* Doc. [470] at 130:16-18. As part of that, he encouraged his friends to submit fake one-star Google reviews for Tom's business. *See* Doc. [470] at 121:1-9; 123:1-6; 134:6-25. There was also evidence that Joe, while pretending to be a neighbor of Tom, filed anonymous reports with the City of Des Peres, where Tom lived, alleging various code violations at Tom's property, which caused Tom to be investigated by municipal authorities on multiple occasions. *See* Docs. [469] at 191-94; [470] at 138-144; 153-162. There was additional evidence that, as part of the so-called slime campaign, Joe signed a letter written by his brother Chris Hoffmann (the CEO of Hoffmann Brothers) and sent to numerous family members, including aunts, uncles, and cousins, which implied that Tom was acting in a deceitful, manipulative, and fraudulent manner. *See* Doc. [469] at 155-163; [170] at 135-38. Additionally, as discussed above, there was evidence that Joe signed his uncle up for multiple websites, such as Realtor.com and AutoTrader.com, in an effort to annoy Tom with spam calls, texts, and emails. Doc. [470] at 145:18-25; 164-165.

All such evidence was relevant to Joe's state of mind and his intent, and it was sufficient to allow a reasonable juror to find that Joe acted with the requisite evil motive or reckless indifference to his actions' consequences to justify punitive damages. Plaintiff raised this issue

16

at the Rule 50 conference, and the Court found that Defendants had made a submissible case for punitive damages. Doc. [484] at 155:13-19. Plaintiff provides no reason to reach a different conclusion now.

Construing all factual issues in the light most favorable to the jury verdict, the Court concludes there was sufficient evidence for a reasonable jury to find in favor of Tom on his prima facie tort claim, and Plaintiff is not entitled to judgment as a matter of law on the claim. Additionally, for all the reasons discussed above, the outcome is not "against the great weight of the evidence so as to constitute a miscarriage of justice," and Plaintiff is not entitled to a new trial on this claim. *Bank of Am., N.A. v. JB Hanna LLC*, 766 F.3d 841, 851 (8th Cir. 2014).

## II. The Court did not err in submitting to the jury Defendants' contractual consent trademark defense.

Defendants have long maintained, and they argued at trial, that the clause in the 2011 Settlement Agreement entitled "Payment for Protection of Trade Name" unambiguously permitted Tom to use the name "Hoffmann" in conjunction with a new HVAC business after four years from the date of the Settlement Agreement, and thus Plaintiff consented to Defendants' allegedly infringing use. The Settlement Agreement states in relevant part:

> Company recognizes that Tom had and continues to have relationships with Company's customers and believes customers associate Tom's name with the Company, and as a result, Company shall pay Tom Six Hundred Thousand Dollars ($600,000) . . . . In exchange for the Trade Name Payments, Tom agrees that for four (4) years after the date of execution of this Agreement, he will not use the Hoffmann name within the business of an HVAC business . . . .

Doc. [251-2] at 3 *SEALED*.

Plaintiff asserts that the clause is unambiguous as a matter of law, because contract language is ambiguous only if there "is more than one *reasonable* construction," and it would be unreasonable for the clause to mean that Tom could use the name "Hoffmann" "without restriction" after four years "without regard to trademark law"; rather, it could mean only that he could use his name in a manner that did not otherwise violate trademark law. Doc. [475] at 12. Plaintiff insists that it would be unreasonable to interpret the provision to mean that Plaintiff had "forever renounced the protection of trademark law" after the four-year term expired. *Id*. at 13. So, Plaintiff asserts, the Court erred as a matter of law in finding the trade name clause ambiguous, as that finding was based on the premise that Defendants' interpretation could be one

reasonable interpretation of the clause even though it was patently unreasonable.  *Id*.  As a result, Plaintiff argues, Defendants' contractual consent defense should never have gone to the jury.  *Id*.

The Court concluded long ago that the trade name clause in the Settlement Agreement was ambiguous as a matter of law.  The Court addressed this issue in response to Defendants' motion for summary judgment, finding Defendants' interpretation of the clause "plausible," but noting that Plaintiff's alternative interpretation was "equally reasonable" and concluded that "[b]ecause there is more than one reasonable construction of this provision, Defendants have not met their burden to demonstrate the absence of a genuine issue of material fact . . . [and] summary judgment on this basis must be denied."  Doc. [362] at 22.  The Court did not lightly reach that determination, and it finds no reason to reverse it now and instead hold that no reasonable jury could find that the Settlement Agreement provided Defendants with the unrestricted right to use "Hoffmann" as part of an HVAC company name.  The question of the parties' intent with respect to the trade name clause was therefore properly submitted to the jury.  *See NTD 1, LLC v. Alliant Asst Mgmt. Co., LLC*, 362 F. Supp. 3d 664, 682 (E.D. Mo. 2019) (citation omitted) ("Once an ambiguity has been found, the parties' intent can be determined through the use of extrinsic evidence.  Resolution of an ambiguity through extrinsic evidence is a question of fact to be determined by the finder of fact.").

Plaintiff also argues that the evidence at trial refuted Defendants' proposed interpretation of the trade name clause, asserting that Tom "unequivocally testified that he did not have an unrestricted right to use 'Hoffmann,'" and that this fatally undermines Defendants' purported argument that the Settlement Agreement gave Defendants the right to use the name "Hoffmann" after the four-year period expired in any manner whatsoever.  Accordingly, Plaintiff asserts, the Court erred in submitting the contract interpretation issue to the jury.  Doc. [475] at 14.  Alternatively, Plaintiff argues that the jury's verdict on this issue was against the weight of the evidence.  *Id*.

Plaintiff mischaracterizes the evidence at trial.  Defendants argued at trial that the Settlement Agreement allowed Tom to use his name as part of the name of his HVAC company in any way, and Tom testified to that belief multiple times.  *See* Doc. [482] at 143:25; 144:1-6; 178:24-25; 179:1-5; 200:25; 201:1-9; 202:1-4.  Tom also testified, however, that he believed he should avoid using the word "Brother" (i.e., together with "Hoffmann") in his business name to avoid customer confusion.  *See id*. at 144:7-24.  One exchange between Tom and Plaintiff's

counsel is illuminating.  Counsel asks Tom whether his "position is that under the settlement agreement after four years you could use the Hoffmann name in any way you like without restriction, correct?" and Tom answers, "Correct." Doc. [482] at 143:17-20.  Plaintiff's attorney next asks, "Well . . . without restriction means without restriction, right?  Then I'm wondering, I just want to confirm that that is your view of the contract . . . you have no limits on your use of the Hoffmann name after four years, and you believe that the contract gave you that right, correct?"  *Id*. at 143:25; 144:1-5.  Tom responded "Yes, the contract and e-mails from the attorneys, yes."  *Id*. at 144:6.  Then, to the question, "Mr. Hoffmann, could you have named your business Hoffmann Brother if you had wanted to?" Tom answered "No."  *Id*. at 144:7-9.  Counsel responded, "Didn't you just say that this contract gave you an unrestricted right to use your name in a business name?" and Tom replied, "Not that way."  *Id*. at 144:10-12.  Plaintiff's attorney went on to ask again if Tom could have named his business "Hoffmann Brother," and Tom said no, explaining that his understanding was that he could not use the name "Hoffmann" coupled with the word "Brother."  *Id*. at 144:17-24; 145:13-14.  But Tom proceeded to testify again that he believed the 2011 Settlement Agreement gave him the right to use *his name*, Thomas Hoffmann, in the name of his HVAC company after four years.  *Id*. at 145:22-25.

Tom's testimony does not provide the admission Plaintiff relies on.  It indicates that Tom believed that there was a limitation on his use of the word "Brother" *in conjunction with* "Hoffmann" in his business name, but not that he believed there was a limitation on his use of "Hoffmann" alone.  Tom further testified that he would not have entered into the Settlement Agreement if he thought it meant that, after the expiration of four years, he would still be restricted from using his own name in connection with his HVAC company.  Doc. [482] at 201: 3-9.  That is consistent with Defendants' position during the jury instruction conference.  When the undersigned asked Defendants' attorney for proposed language on this issue, he suggested that the instruction should state, "Tom claims that the parties intended section three [of the Settlement Agreement] to mean that, after four years, Hoffmann Brothers agreed that he could use the Hoffmann name as part of an HVAC business."  Doc. [485] at 26.

The jury also heard evidence that Plaintiff's President, Counterclaim Defendant Robert Hoffman, may also have believed that the Settlement Agreement allowed Tom to use his name in connection with his HVAC company after four years passed.  Robert testified that, in an email

submitted to the Better Business Bureau[9] in September 2017, he wrote that "[p]er our agreement with Tom, he's allowed to use the Hoffmann name in his business name." Doc. [480] at 74:3-5. The "agreement" Robert referred to in the email was the 2011 Settlement Agreement. *Id.*

When Plaintiff moved at trial to exclude Defendants' contractual consent defense, after hearing from both sides, the Court denied the motion, stating, "Thank you.  And I think that little difference of opinion was a dramatic play of exactly why a reasonable juror could go either way with the evidence that has been presented. . . . I am not prepared to decide that no reasonable juror could find in favor of Defendants on these facts . . . ." Doc. [484] at 163:4-7, 164:10-14. The Court sees no reason to reach a different conclusion now.

Construing all factual issues in the light most favorable to the jury verdict, the Court concludes there was sufficient evidence for a reasonable jury to find in favor of Tom on his contractual consent defense.  Additionally, for all the reasons discussed above, the outcome was not "against the great weight of the evidence so as to constitute a miscarriage of justice," and Plaintiff is not entitled to a new trial on this issue.  *Bank of Am., N.A. v. JB Hanna LLC*, 766 F.3d 841, 851 (8th Cir. 2014).

## III.    The jury instructions fairly and adequately submitted the issues to the jury.

Plaintiff moves for a new trial on its trademark claims due to instructional error.  A new trial can be granted if there is instructional error and the objecting party can "demonstrate that it was prejudiced."  *See McKay v. WilTel Commc'n Sys., Inc*., 87 F.3d 970, 976 (8th Cir. 1996). The Court must consider "whether the instructions, taken as a whole and viewed in the light of the evidence and applicable law, fairly and accurately submitted the issues to the jury."  *Slidell, Inc. v. Millennium Inorganic Chems., Inc*., 460 F.3d 1047, 1054 (8th Cir. 2006); *see also Gasper v. Wal-Mart Stores, Inc.,* 270 F.3d 1196, 1200 (8th Cir. 2001) (same, except that it states the court must determine whether the instructions fairly and "adequately" submit the issues to the jury).  The Court has broad discretion as to the form and language used in jury instructions.  *See Lincoln Composites, Inc. v. Firetrace USA, LLC*, 825 F.3d 453, 461 (8th Cir. 2016).  *See also Gill v. Maciejewski*, 546 F.3d 557, 563 (8th Cir. 2008) ("[A] district court has broad discretion in instructing the jury, and jury instructions do not need to be technically perfect or even a model of clarity.") (quoting *B & B Hardware, Inc. v. Hargis Indus., Inc*., 252 F.3d 1010, 1012 (8th Cir.

---

[9] Robert's email expressed concern that Tom's new company name, Hoffmann Air Conditioning & Heating, might be misleading customers.  *See* Doc. [480] at 73:18-21.

2001)).  A district court should not order a new trial unless the objecting party can show that the error had "a probable effect on [the] verdict."  *Burry Eustis Plumbing & Heating, Inc.*, 243 F.3d 432, 434 (8th Cir. 2001).

After extensive negotiations among the parties and the Court, the jury was presented with 10 instructions specifically related to Plaintiff's trademark claims.  Doc. [455] at 10-26.  Plaintiff takes issue with Instruction No. 14, which addressed customer confusion, and Instruction No. 12, which addressed the distinctiveness of Plaintiff's mark.  *See* Doc. [475] at 15-16, 18-21.  As further discussed below, the Court does not find either instruction erroneous, and Plaintiff has not met its burden to show that any alleged error had a probable effect on the verdict.

### A. Instruction No. 14 did not place an erroneously high burden on Plaintiff and did not contain improperly prejudicial language.

Instruction No. 14 addressed customer confusion.  Doc. [455] at 19.  In part, the instruction described the concept of initial interest confusion.  Initial interest confusion is the legal theory that "[i]nfringement can be based upon confusion that creates initial customer interest, even though no actual sale is finally completed as a result of the confusion." 4 McCarthy on Trademarks and Unfair Competition § 23:6 (5th ed.).  Initial interest confusion has been recognized by federal courts for several decades but was only recently adopted by the Eighth Circuit, in 2021.  *See Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 365 F. Supp. 707 (S.D.N.Y. 1973), *aff'd* 523 F.2d 1331 (2d Cir. 1975) (one of the first cases to adopt the initial interest confusion test); *Select Comfort Corporation v. Baxter*, 996 F.3d 925, 936 (8th Cir. 2021) ("We now . . . hold that a theory of initial interest confusion may apply in our circuit.").

Plaintiff asserts that Instruction No. 14 placed a higher burden on it than required by law in connection with proving initial interest confusion.  The instruction stated, in relevant part:

> In order to determine whether you may take initial interest confusion into account when assessing likelihood of confusion, you must first decide whether the average Hoffmann Brothers customer is a "sophisticated purchaser" who exercises a high degree of care when making the decision to purchase the particular product or service in question.  If you determine that the average Hoffmann Brothers customer is not a sophisticated purchaser, you may then consider the likelihood of initial interest confusion as well as the likelihood of confusion that results in a sale.

Doc. [455] at 19.  Plaintiff argues that it was erroneous to require the jury to first determine whether the average Hoffmann Brothers customer was a "sophisticated purchaser" before going

on to consider initial interest confusion.  *See* Doc. [475] at 16.  Specifically, Plaintiff asserts that it was contrary to the Eighth Circuit's holding in *Select Comfort*.  *Id*.  The Court disagrees.  To the contrary, the undersigned took great care to ensure that the instruction aligned with the Eighth Circuit's recent decision in *Select Comfort*, and upon revisiting the issue now, still believes that the instruction fairly and accurately described the issue for the jury.

In *Select Comfort*, the Eighth Circuit stated that "the theory of initial interest confusion cannot apply in our Circuit where the relevant average consumers are sophisticated at the level of the careful professional purchasers who were at issue in *Sensient*," and that the "finding of customer sophistication typically will rest with the jury."  *Select Comfort*, 996 F.3d at 936 (citing *Sensient Techs. Corp. v. SensoryEffects Flavor Co*., 613 F.3d 754, 766 (8th Cir. 2010).[10]  In accord with that directive, the instruction properly cabined the jury's consideration of initial interest confusion by first requiring it to determine whether Plaintiff's average customers were "sophisticated purchasers."  The Court considered this same objection at the jury instruction conference, stating "[a]s far as asking [the jury] to make that preliminary determination, I just think the language in *Select Comfort* is very clear . . . that the level of sophistication is a jury determination and that whether or not initial interest confusion can be determined depends on the level of sophistication.  And so, I think it's appropriate to advise the jury that they need to consider first whether these where sophisticated consumers and then the question of initial interest confusion, if they find that they were not."  Doc. [485] at 13:9-18.

In addition, whether the jury found Plaintiff's customers to be sophisticated purchasers is unknown.  It is plausible that the jury determined that Plaintiff's customers were not "sophisticated purchasers" and proceeded to consider initial interest confusion under the likelihood of confusion factors.  It is also plausible that the jury never reached the issue of likelihood of confusion because it found that Plaintiff had consented to Defendants' use of the allegedly infringing mark or that Plaintiff failed to establish a valid trademark.  Plaintiff has not shown that the alleged error had a "probable effect on [the jury's] verdict."  *Burry*, 243 F.3d at 434.  The Court denies Plaintiff's motion on this point.

---

[10] In *Sensient*, the Court held that because the plaintiff's customers were "sophisticated and exercise[d] a relatively high degree of care in making their purchasing decisions," the application of initial interest confusion was properly rejected by the district court.  *Sensient Techs. Corp. v. SensoryEffects Flavor Co*., 613 F.3d 754, 766 (8th Cir. 2010).

Plaintiff also argues that Instruction No. 14 "improperly included other prejudicial language." Doc. [475] at 17.  First, Plaintiff objects to one of the paragraphs describing actual confusion of customers, which stated, "[a]ctual confusion includes only confusion caused by Defendants' use of the mark, not by a customer's carelessness or inattentiveness.  You must consider the extent of any instances of actual confusion in the context of the total number of opportunities for confusion." Doc. [455] at 20.  Plaintiff argues that the language is prejudicially "directive and argumentative" and not in alignment with Eighth Circuit law, since the Eighth Circuit has not explicitly held that the extent of actual confusion should be considered in the context of the number of opportunities for such confusion.  Doc. [475] at 17-18.  Plaintiff also notes that "the test for infringement lies in the likelihood of confusion, not actual confusion; therefore, plaintiffs are not required to prove any instances of actual confusion." Doc. [475] at 18 (quoting *H&R Block, Inc. v. Block, Inc.*, 2022 WL 1316222, at *23 (W.D. Mo. Apr. 28, 2022)).  Although it is not entirely clear, the Court takes Plaintiff to be suggesting that, in addition to being overly "directive and argumentative" about how to evaluate the extent of actual confusion, the instruction may also have given the jury the mistaken impression that it must find actual confusion in order to find infringement.

At the jury instruction conference, Plaintiff objected to the paragraph of the instruction that included the currently contested language on the basis that it went "beyond the bounds of what has been established in the Eighth Circuit as instructing the jury about conclusions to make about the circumstances of the actual confusion." Doc. [485] at 14:13-16.  In response, the Court noted that the language that is now in dispute came from Ninth Circuit Model Jury Instructions and McCarthy on Trademark, and that it is consistent with the Eighth Circuit's analysis in *Sensient*, where it advised that, in analyzing instances of actual confusion, weight is given to their "number and extent."[11]  Doc. [485] at 14:25-15:4 (citing *Sensient*, 613 F.3d at 768, in turn quoting *Duluth News-Tribune v. Mesabi Pub. Co.*, 84 F.3d 1093, 1098-99 (8th Cir. 1996)); and 4 McCarthy on Trademarks and Unfair Competition § 23:14 (5th ed. 2022)).

The Court continues to find the instruction to be consonant with the Eighth Circuit's instruction to give weight to the nature and extent of instances of actual confusion.  Moreover, if

---

[11] *Sensient* laid out a six-factor test to determine whether a reasonable jury could find a likelihood of confusion to customers; the fifth factor is "incidents of actual confusion."  *Sensient*, 613 F.3d at 763 (citing *Frosty Treats Inc. v. Sony Computer Ent. Am. Inc.*, 426 F.3d 1001, 1008 (8th Cir. 2005)).

the instruction was erroneous, any possibility of prejudice—that is, that the jury might, as a result of the contested language, have either mistakenly required evidence of actual confusion or mistakenly underestimated the significance of Plaintiff's evidence of actual confusion—was countered by the very next sentence of the instruction, which explained that "[e]vidence of actual confusion, while not required, is strong evidence of a likelihood of confusion."  Doc. [455] at 19; *see McKay,* 87 F.3d at 976 (new trial not necessary unless an objecting party can demonstrate that it was prejudiced).  Thus, the Court finds that Instruction No. 14 fairly and adequately submitted the issue of actual confusion to the jury.

Plaintiff next objects to Instruction No. 14's statement that "[e]vidence of third-party use of similar marks on similar goods and/or services is relevant to evaluation of the strength or weakness of the mark and how much protection it is entitled to."  Doc. [455] at 20-21.  The instruction listed six factors for jurors to consider when determining whether there was a likelihood of consumer confusion:  (1) evidence of actual confusion; (2) the similarity between Plaintiff's trademark and Defendants' marks; (3) the strength of the Hoffmann Brothers mark; (4) the degree of competition between Plaintiff's and Defendants' services; (5) whether Defendants intended to confuse customers; and (6) the degree of care reasonably expected of potential customers.  *Id.*  Plaintiff objects to the inclusion of the "evidence of third party use" as part of the explanation of the third factor, the strength of the mark, arguing that Instruction No. 12, which addressed distinctiveness and secondary meaning, already included an instruction on the exclusivity of the mark,[12] and it was improper to "repeat an instruction regarding third-party use in the likelihood-of-confusion instruction."  Doc. [475] at 19.

Plaintiff appears to argue that third-party use is relevant only to distinctiveness and not to likelihood of confusion, but Plaintiff might simply be complaining that the instruction was redundant.  Either way, the argument fails.  Plaintiff cites *Lovely Skin, Inc. v. Ishtar Skin Care Prod. LLC*, 745 F.3d 877, 885 (8th Cir. 2014), which states that "[e]vidence of third parties using marks similar to [plaintiff's] trademarks can demonstrate that the use of [plaintiff's] trademarks was not substantially exclusive and, thus, might demonstrate that [plaintiff's] trademarks had not

---

[12] Instruction No. 12 listed 7 factors the jury could consider when deciding whether Plaintiff's mark had acquired distinctiveness, one of which was "[w]hether the Plaintiff Hoffmann Brothers' use of the claimed service mark was exclusive."  Doc. [455] at 15.

acquired distinctiveness."[13]  *Id*.  But the fact that third-party use is relevant to distinctiveness has no bearing on whether third-party use is relevant to likelihood of confusion.  Nothing in *Lovely Skin* precludes third-party use being relevant to both distinctiveness *and* likelihood of confusion.

The phrasing at issue was discussed at the jury instruction conference, where Plaintiff expressed concern that the instruction may be "confusing and redundant."  Doc. [485] at 18:19-21.  After further discussion between the parties and the Court, Plaintiff explicitly stated, "I think [the Court] can instruct the jury that evidence of third-party use is relevant to considering the strength of the mark" in Instruction No. 14.  Doc. [485] at 21:7-9.  Thus, Plaintiff has waived any objection on relevancy grounds.  In any case, the instruction is plainly consistent with the law in the Eighth Circuit, which has long held that third-party use is relevant to the strength of a mark.  *See, e.g.*, *General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 626-27 (8th Cir. 1987) ("[E]vidence of third-party usage of similar marks on similar goods is admissible and relevant to show that the mark is relatively weak and entitled to a narrower scope of protection.").

The relevant parts of Instructions No. 12 and 14 are also not confusingly or prejudicially similar.  Instruction No. 12 stated that the jury could consider "[w]hether the Plaintiff Hoffmann Brothers' use of the claimed service mark was exclusive" as relevant to the jury's consideration of distinctiveness, which is true.  Doc. [455] at 15; *Lovely Skin*, 745 F.3d at 882. At the same time, whether there was "[e]vidence of third-party use of similar marks" was relevant to the jury's consideration of likelihood of confusion, as instructed in Instruction No. 14.  *Id*. at 20; *see General Mills, Inc.*, 824 F.2d at 626.  Because exclusivity (as described in Instruction No. 12) and third-party use (as described in Instruction No. 14) are proper factors for the jury to consider in their respective contexts, it only makes sense to include somewhat similar language in the two instructions.  In fact, it would have been misleading to do otherwise, since their inclusion was necessary in order to fairly and adequately submit each issue to the jury.

Plaintiff also objects to language in Instruction No. 14 stating, "[k]nowledge of another's services, and an intent to compete with those services, is not equivalent to an intent to mislead and cause consumer confusion."  Doc. [455] at 21.  Plaintiff argues that the language is not "a general proposition of law so much as an argument that Defendants could have made in

---

[13] Plaintiff also cites *Sensient*, 613 F.3d at 770, for the proposition that third-party use is relevant to the distinctiveness of a mark, but the cite is inapt.  The Eighth Circuit did not make any finding about third-party use and distinctiveness in *Sensient*; it merely described the district court's analysis of the subject.

closing arguments." Doc. [475] at 19. As such, Plaintiff asserts that the language was biased and improper. *Id*. at 20. Plaintiff raised this same objection at the jury instruction conference, and the Court rejected it, noting that the language comes directly from *Sensient*. Doc. [485] at 24; *see also Sensient*, 613 F.3d at 766 ("Knowledge of another's product and an intent to compete with that product is not . . . equivalent to an intent by a new entrant to a market to mislead and to cause consumer confusion.") (citation omitted).

The Court finds no reason to reach a different conclusion now. Determining whether there is a likelihood of confusion in the trademark context is a complicated undertaking that could be difficult for a jury of laypeople to understand. Without the contested language the jury might have improperly believed that the mere intent to compete with another business with a similar name was legally equivalent to an intent to cause confusion.

Finally, Plaintiff objects to Instruction No. 14's statement that, "[t]o show a likelihood of confusion, Plaintiff must show a probability of confusion, not a mere possibility." Doc. [455] at 19. Plaintiff argues that the language is repetitive and confusing. Doc. [475] at 20. Because Plaintiff did not raise any objection to this language at trial, it may not do so now. Parties must make objections to jury instructions with enough clarity "to inform the trial judge of possible errors so that he [or she] may have an opportunity to correct them." *See Brown v. Sandals Resorts Int'l*, 284 F.3d 949, 954 n.6 (8th Cir. 2002) (alterations in original) (quoting *Meitz v. Garrison*, 413 F.2d 895, 899 (8th Cir. 1969)). In any event, the language comes directly from *Lovely Skin*, 745 F.3d at 887, and its inclusion in the instructions was not erroneous or confusing.

**B. Instruction No. 12 was not ambiguous or unfairly biased.**

Plaintiff objects to the inclusion of the following at the end of Instruction No. 12: "Descriptive marks are entitled to protection only as broad as the secondary meaning they have acquired, if any. If they have acquired no secondary meaning, they are entitled to no protection and cannot be considered a valid mark." Doc. [455] at 16. Plaintiff argues that "the language is ambiguous and unfairly biased against a finding of secondary meaning" for its mark, and that it was so vague as to create a roving commission. Doc. [475] at 20.

Instruction No. 12 began by stating that a "descriptive trademark can be valid if it has acquired secondary meaning," then went on to explain that secondary meaning may be found if the mark has "acquired distinctiveness," and then listed several factors to consider in determining whether the Hoffmann Brothers mark was distinctive, before concluding with the contested text.

Doc. [455] at 16.  Far from creating a roving commission, the language was directly tied to the factors listed directly above it, and it served to help the jury better understand the connection between those factors and the validity of a mark.

Plaintiff does not actually argue that the text is legally incorrect, but the Court notes that it was taken directly from the Ninth Circuit Model Jury Instructions.  *See* Model Civ. Jury Instr. 9th Cir. 15.11 (2021).  Also, virtually identical phrasing has been used in the same context by other district courts in this circuit without objection from the Eighth Circuit.  *See, e.g.*, *Just Enters., Inc. v. Justice Inc.*, 2009 WL 2874220 (W.D. Mo. June 1, 2009); *Gateway, Inc., v. Companion Products, Inc*., 2003 WL 25719196 (D.S.D. Feb. 7, 2003).

Plaintiff objected to the inclusion of the same language at trial, and the undersigned overruled the objection, stating that "it's an accurate statement of law," and that, "in light of the fact that there were factors listed above it, reorienting the jury about the role secondary meaning plays in the overall consideration was appropriate."  Doc. [485] at 8.  Plaintiff has provided no reason for the Court to reach a different conclusion now.

Instruction Nos. 12 and 14 accurately incorporated applicable law, fairly and adequately submitted the issues to the jury, and to the extent any error occurred, it did not affect Plaintiff's substantive rights.  Therefore, the Court denies Plaintiff's motion for new trial based on instructional error.

## IV.   The alleged evidentiary errors are not grounds for granting a new trial.

Plaintiff moves for a new trial, alleging that the Court made several evidentiary errors that "were unduly prejudicial to Hoffmann Brothers and warrant a new trial."  Doc. [475] at 20. "Unless justice requires otherwise, no error in admitting or excluding evidence . . . is ground for granting a new trial . . . ."  Fed. R. Civ. P. 61.  When a motion for new trial is based on evidentiary rulings, the movant must "show the error affected his substantial rights and that a new trial would likely produce a different result."  *Am. Fam. Mut. Ins. Co. v. Graham,* 792 F.3d 951, 957 (8th Cir. 2015) (citing *Pointer v. DART*, 417 F.3d 819, 822 (8th Cir. 2005)).  "[N]o error in either the admission or the exclusion of evidence . . . is ground for granting a new trial . . . unless refusal to take such action appears to the court inconsistent with substantial justice."  *Ladd v. Pickering*, 783 F. Supp. 2d 1079, 1086 (E.D. Mo. 2011) (quoting *Harris v. Chand*, 506 F.3d 1135, 1138 (8th Cir. 2007)) (alterations in original); *see also Gareis v. 3M Company*, 9 F.4th 812, 816 (8th Cir. 2021) ("[W]e we will not set aside a verdict or grant a new

trial due to an erroneous evidentiary ruling unless that ruling was prejudicial."). In other words, a movant must show "that [the challenged] rulings had a substantial influence on the jury's verdict." *Vogt v. State Farm Ins. Co.,* 963 F.3d 753, 771 (8th Cir. 2020) (quotation omitted).

As set forth below, Plaintiff has failed to show that any of the Court's evidentiary rulings "affected his substantial rights" or "that a new trial would likely produce a different result." *Am. Fam. Mut. Ins. Co.,* 792 F.3d at 957.

### A. The Court properly admitted evidence about third-party HVAC companies.

Plaintiff argues that the Court allowed Defendants to introduce evidence related to local third-party HVAC companies, including Hoffman Plumbing (which has no connection to Plaintiff) in violation of its ruling on Plaintiff's motion in limine on this subject. Doc. [475] at 21. Plaintiff claims that the Court's ruling in limine restricted Defendants to introducing such evidence for only the "limited purpose of refuting Defendants'[14] claim of secondary meaning," but that at trial, Defendants were allowed to "solicit[ ] testimony from owners of these third-party companies that was outside the bounds of this ruling." *Id.* One example offered by Plaintiff of such improper evidence is the "testimony from Jeff Vitt, the owner of a local HVAC company, and Mark Waters, the owner of Hoffman Plumbing, about their experience with misdirected phone calls." *Id.* Plaintiff also complains that Waters should not have been allowed to testify "about whether Hoffmann Brothers had expressed to him that it had any issue with coexisting with Hoffman Plumbing." *Id.* Plaintiff asserts that "evidence of confusion between Hoffmann Brothers and a third-party or third-parties' use of Hoffmann Brothers' mark is not relevant to the issue of whether Defendant is infringing on Hoffmann Brothers' mark," and that admitting this evidence was unfairly prejudicial to Plaintiff. *Id.*

In its motion in limine, Plaintiff sought to exclude such third-party evidence altogether, or in the alternative, that it be limited to refuting Plaintiff's claim of secondary meaning for its mark. Doc. [397] at 4. Plaintiff argued that evidence of third-party marks that are similar to the mark being asserted "is only relevant to the strength of the asserted mark," and that a "trademark owner's tolerance of third-party uses of his marks will not bar enforcement of his rights against an infringing user." Doc. [397] at 2-3 (citing *Quality Inns Intern., Inc. v. McDonald's Corp.*, 695 F. Supp. 198, 214 (D. Md. 1988). Plaintiff also argued that evidence of customer confusion

---

[14] The Court assumes that Plaintiff meant to refer to its own claim of secondary meaning.

between Plaintiff and other companies (e.g., testimony that third-party HVAC companies receive calls from customers who are looking for Plaintiff) was not relevant, because the "only relevant confusion is between Hoffmann Brothers and Hoffmann AC." *Id*.

Defendants opposed the motion, arguing that while the evidence was certainly relevant to the strength of Plaintiff's mark, it was also relevant to other aspects of the case. Doc. [412] at 3. Defendant noted, for example, that trademark law does not protect against customer confusion in a general sense. *Id*. So, evidence that consumers were confused due to their own carelessness or inattentiveness is not the sort of customer confusion that supports Plaintiff's claims, and thus, testimony from third-party HVAC companies about misdirected calls they received from consumers who were looking for Plaintiff (or other HVAC companies) was relevant to assessing whether Plaintiff's evidence of alleged confusion was actually trademark confusion or merely consumer carelessness. *Id*. Defendant also argued that the very existence of third-party HVAC companies with similar names to Plaintiff was relevant to whether Plaintiff had abandoned its trademark protection rights by "permitting third-party companies to use similar names in the same market." *Id*. at 4.

In response to Plaintiff's motion in limine, the Court refused to issue a blanket exclusion of evidence relating to third party HVAC companies: "The Court is not persuaded that the categorical exclusion of all evidence related to third party companies is justified on any of the bases argued in the motion. Plaintiff may lodge objections based on irrelevance [or] confusion . . . as evidence is presented at trial." Doc. [429] at 1.

Unfortunately, Plaintiff neglected to provide any citations to guide the Court to allegedly problematic testimony on this subject. After reviewing the 1,934-page trial transcript, the Court identified some testimony that seems to fall into the category to which Plaintiff purports to object, and so it proceeds with analysis of that testimony.

Jeffrey Vitt, the owner of Vitt Heating & Air Conditioning, testified that as often as "several times a week" his company received calls from customers who contacted his company thinking they were contacting one of his HVAC competitors. Doc. [481] at 110:12-13. Assuming Mr. Vitt's testimony is an instance of the testimony Plaintiff now objects to, the Court

notes that Plaintiff did not object to that testimony at trial and instead proceeded to cross-examine Vitt.  *Id*. at 112-14.

Mark Waters, the owner of Hoffman Plumbing and Heating, an HVAC company that has operated in the St. Louis area since 1949, testified at trial that customers trying to reach Plaintiff contact his company "every day," and that it had been happening for approximately as long as Plaintiff had been in business.  Doc. [482] at 19:11-20.  Waters also testified that Plaintiff had contacted him within the last two years asking if they could buy his name, but he declined.  *Id*. at 21:21-25; 22:25; 23:1-4.  Again, Plaintiff lodged no objection to Waters' testimony.

Plaintiff's failure to object to Vitt's or Waters' testimony at trial prevents this Court from granting Plaintiff's motion for new trial on this basis unless there was plain error.  *See McKnight v. Johnson Controls, Inc.*, 36 F.3d 1396, 1407-08 (8th Cir. 1994).  The admission of Vitt's and Water's testimony was not plain error.  As Defendant argued in opposition to Plaintiff's motion in limine, testimony about consumers calling one HVAC company while thinking they were contacting another was relevant to whether alleged trademark confusion was actually consumer carelessness or inattentiveness.

## B. The Court properly admitted evidence of Defendants' damages theory for the prima facie tort claim.

Plaintiff argues that the admission of Defendants' damages theory and supporting evidence on the prima facie tort claim unfairly prejudiced Plaintiff, was not curable, and disrupted the trial.  Doc. [475] at 21.  Plaintiff maintains that the evidence should not have been admitted, and the Court must grant a new trial at which all evidence of such damages is excluded.  *Id*.  As discussed more fully above, the Court disagrees that the evidence was admitted erroneously.  *See* Section I.C., *supra*.  Accordingly, Plaintiff has failed to show that this evidentiary ruling "affected [its] substantial rights," and a new trial is not warranted.  *Am. Fam. Mut. Ins. Co.,* 792 F.3d at 957.

## C. The Court properly admitted evidence of Joe's intent, which was relevant to Tom's prima facie tort claim.

Plaintiff asserts that certain evidence of Joe's conduct—including the family letter, the false reports to Des Peres municipal agencies, and the "slime campaign" to encourage people to leave negative reviews of Tom's business on Google Review—was relevant only to claims that had been dismissed on summary judgment.  Doc. [475] at 21.  Plaintiff objected to the admission of the evidence at trial, but the Court allowed it in on the grounds that it was relevant

30

to show Joe's intent when posing as Tom online, which was a necessary element of Tom's prima facie tort claim. *See* Docs. [429] at 5; [464] at 67; [484] at 155:13-19. Plaintiff argues that the Court erred in admitting the evidence, as it was "highly inflammatory" and not relevant to or probative of Tom's tort claim. *Id*. The Court disagrees. As more fully discussed above, the evidence admitted was probative of Joe's intent when he posed as Tom online. *See* Section I.E., *supra*. Joe's behavior was part of a series of events, consideration of which helped the jury understand Joe's state of mind concerning his uncle during the relevant time period. Plaintiff has failed to show that this evidentiary ruling "affected [its] substantial rights," and a new trial is not warranted on this point. *Am. Fam. Mut. Ins. Co.,* 792 F.3d at 957.

### D. The Court properly excluded evidence of certain customer confusion events.

Plaintiff argues that the Court erred in excluding post-discovery evidence of customer confusion, including screenshots of two posts about Defendants' company, plus comments related to the posts, that appeared on the website Nextdoor.com. Doc. [475] at 22. The Court disagrees.

On May 3, 2022, after discovery closed in this matter, Plaintiff served Defendants with supplemental productions of newly discovered instances of purported customer confusion between the two companies. *See* Docs. [389] at 2; [464] at 143:20-23. Defendants filed a motion in limine to exclude the evidence, arguing, among other things, that information found on private websites like Nextdoor.com was incapable of authentication. *Id*. at 6 (citing *Fraserside IP L.L.C. v. Netvertising Ltd*., 902 F. Supp. 2d 1165, 1180 n. 9 (N.D. Iowa 2012) (collecting cases holding that private websites are "not self-authenticating"). The Court granted Defendants' motion and excluded the evidence, noting that "[s]ocial media posts are readily manipulable and there is insufficient time between production and trial for Defendants to adequately conduct discovery to confirm or challenge the evidence." Doc. [429] at 6. The Court further excluded the evidence on the basis that it "contains content whose probative value is substantially outweighed by the danger of unfair prejudice." *Id*. Plaintiff complains that the Court erred when it excluded such evidence, arguing that it had witnesses who "took the screenshots and/or created either the post itself or comments to the post," and who could have testified at trial to authenticate the posts. Doc. [475] at 22.

This matter was discussed at length at the pretrial conference, and Plaintiff has not offered any additional argument in the instant motion that was not already presented to and

considered by the Court when it issued its ruling in limine. *See* Doc. [464] at 146-59. At the conference, in order to authenticate the evidence, Plaintiff offered the testimony of two of its employees who took the screenshots in questions. *Id*. at 147:12-14. Plaintiff also offered the testimony of Defendants' marketing consultant to authenticate a comment that she posted. *Id*. at 147:15-17. The Court acknowledged that their proffered testimony could verify that the screenshots represented the website as it appeared when they took the shots, as well as the information that they posted themselves. *Id*. at 147:18-19. But the Court was, and remains, concerned as to how such testimony would authenticate the comments or posts by other unknown people. As the undersigned stated at the pretrial conference, "If there are aspects of the posting that relate to people who are in the courtroom that we can bring in through the people in the courtroom, that's one thing. But to have just the, in isolation, a screenshot of someone's comment on a screen or on social media without knowing any more and not having the opportunity then to try to find out any more because there's just not any time, about who those people were and what their actual experiences were, I think is prejudicial to Defendants, and so I'm going to exclude it." *Id*. at 153:6-14.

If exclusion of the screenshots was erroneous, it was harmless error, as the Nextdoor.com screenshots were not the only evidence that spoke to customer confusion. *See Porchia v. Design Equip. Co., a Div. of Griffith Laboratories*, 113 F.3d 877, 881 (8th Cir. 1997) (holding harmless any error by district court in excluding evidence where other evidence was admitted on the same issue) (citing *Monger v. Cessna Aircraft Co.,* 812 F.2d 402, 407-08 (8th Cir.1987). Plaintiff offered evidence from multiple other sources, including testimony from confused customers and testimony from Plaintiff's employees regarding confusion events, to support its arguments about customer confusion, and the Nextdoor.com evidence would have been cumulative at best. *See* Docs. [468] at 283-292; [470] at 72-74; 81-85, 107-115; 200-232; [480] at 195-96. Because Plaintiff has not shown that inclusion of the screenshots "would likely produce a different result," a new trial is unwarranted on this basis. *Am. Fam. Mut. Ins. Co.,* 792 F.3d at 957.

### E.  Plaintiff was not prejudiced by the Court's ruling on whether witnesses could reference Stray Rescue.

Coincident with the third day of the trial in this matter, the Thomas F. Eagleton U.S. Courthouse hosted an employee wellness event in which Court employees were invited to play with puppies in the Courthouse cafeteria. During a lengthy recess for attorney argument, the

Court's staff sought, and received, permission to bring any interested jurors downstairs to play with the puppies.  Unfortunately, the undersigned was unaware at the time that the puppies had been provided by Stray Rescue, which Plaintiff's CEO, Chris Hoffman, had identified in testimony on the first day of trial as a charity supported by Plaintiff.  When Defendants' counsel learned that the jurors had been allowed to attend an event associated with Stray Rescue, he asked the Court to exclude any further reference to Stray Rescue by name.  Doc. [470] at 56:7-10; 57:10-15.

Plaintiff's counsel strenuously objected, arguing that mentioning Stray Rescue by name was vital to Plaintiff's case for secondary meaning, because one witness was expected to testify that she wanted to hire Hoffmann Brothers because of the company's support for Stray Rescue. Counsel argued that it would be "enormously prejudicial" to exclude such evidence of goodwill associated with Plaintiff's mark.  Doc. [470] at 61:24; 62:10-16.  Defense counsel countered that it would be prejudicial to Defendants' case for jurors to hear evidence linking Plaintiff to Stray Rescue right after the jurors had played with puppies provided by that very organization.  *Id*. at 63:6-24.

Weighing the parties' positions, the Court concluded that the risk of prejudice to Plaintiff from excluding further mention of the name "Stray Rescue" was relatively low, both because there had already been testimony linking Plaintiff with Stray Rescue and because Plaintiff's secondary meaning argument, as described by counsel, would be equally well served by testimony that a customer had called Hoffmann Brothers because of its support for a local animal rescue organization without mention of the organization's name.[15]  *Id*. at 64:17-18; 64:22-25; 65:1-6; *see also* Doc. [468] at 277:5-10.  Therefore, the Court granted Defendant's motion to exclude the name "Stray Rescue" for the remainder of the trial.  Doc. [470] at 67:1-10.

Plaintiff has not persuaded the Court that its decision to exclude further mention of Stray Rescue was erroneous.  Moreover, even if it was erroneous, Plaintiff has not shown that it was prejudiced by the exclusion.  Plaintiff did elicit testimony from the witness that she had sought Plaintiff's services because of its support for a local animal rescue charity, and Plaintiff remained free to cite that testimony as evidence of goodwill associated with its mark in support of its case for secondary meaning.  *See* Doc. [480] at 195.  Plaintiff was also free to cite Chris Hoffmann's

---

[15] The Court gave Plaintiff's counsel at least four opportunities to explain how it would harm Plaintiff's case not to reference Stray Rescue by name before drawing this conclusion.  *See* Doc. [470] at 62:4-67:6.

testimony about Hoffmann Brothers' support of many local charitable organizations, including animal rescue groups.  In closing argument, Plaintiff's counsel made no argument relating goodwill generated by Plaintiff's support for community organizations to secondary meaning. Therefore, the claim that Plaintiff's case was materially impacted by the Court's narrow prohibition of the term Stray Rescue for part of the trial is implausible at best.

## V.   The trademark verdict was not against the weight of the evidence.

Finally, Plaintiff argues that the trademark verdict was "against the great weight of the evidence."  Doc. [475] at 22.  Plaintiff asserts that it "presented overwhelming evidence of the requisite elements of its trademark claim," and that the verdict in favor of Defendants "constitutes a miscarriage of justice."  *Id*.  Again, the Court disagrees.

The jury's verdict on Plaintiff's trademark claim was sufficiently supported by the evidence.  The parties presented conflicting evidence related to the elements of trademark infringement.[16]  While Plaintiff arguably presented sufficient evidence to prevail, the jury also heard significant evidence in favor of Defendants' arguments.  Reasonable jurors could have disagreed about which side had more convincing proof and better arguments.  For example, Plaintiff contends that it presented overwhelming evidence of customer confusion.  But as discussed in Section III.A., above, not all customer confusion is actionable under trademark law. Where customer confusion is attributable to customers' inattentiveness or carelessness, such confusion does not support a likelihood of confusion for purposes of trademark law.

While Plaintiff did present evidence of customer confusion, that evidence did not so unequivocal that the jury could not have found it insufficient.  For example, one customer testified that when he needed HVAC services, he wanted to call Hoffmann Brothers so he Googled "Hoffmann HVAC" and "called the first number that came up," which happened to be Defendants'.  Doc. [469] at 240:3-5.  The customer did not click on any search result links; he simply called the phone number.  *Id*. at 244:6-12.  He testified that he had a Hoffmann Brothers service plan, but he did not bother to look at the paperwork for the plan when he needed service; instead, he used a Google search.  *Id*. at 243:20-25; 244:1-2.  He also testified that calling the

---

[16] To prevail on a trademark infringement claim, Plaintiff must establish ownership of a valid, legally protectible mark, and that there is a likelihood of confusion between its mark and Defendants' mark. *B&B Hardware, Inc. v. Hargis Ind., Inc*., 569 F.3d 383, 389 (8th Cir. 2009).  To demonstrate that the mark is valid and protectible, a plaintiff must establish, in the case of a descriptive mark [like the one at issue in this case] that its mark has acquired a secondary meaning."  *Id.*

wrong number was in part attributable to "user error" on his part. *Id*. at 244:18. Such testimony could have led the jury to conclude that some or all of the evidence of customer confusion may have been attributable to customer inattentiveness rather than to trademark infringement.

In the face of conflicting evidence, the jury sided with Defendants. "In determining whether to grant a new trial, a district judge is not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *Lincoln Composites, Inc. v. Firetrace USA, LLC*, 825 F.3d 453, 465 (8th Cir. 2016) (quoting *King v. Davis*, 980 F.2d 1236, 1237 (8th Cir. 1992). And even though a Rule 59 motion allows the Court to rely on its own reading of the evidence, there was nothing in the evidence that caused the Court to disbelieve witnesses or evidence to the extent that it would affect the analysis or substantially shift the weight of the evidence. Because there was sufficient evidence to sustain its verdict, the jury verdict on Plaintiff's trademark claim was not against the "great weight of the evidence so as to constitute a miscarriage of justice," and Plaintiff is not entitled to a new trial on the issue. *Bank of Am.,* 766 F.3d at 851.

## VI.    **Defendants' Motion for Confirmation from the Court Regarding Preliminary Injunctive Relief is granted.**

Defendants seek "confirmation from the Court that the preliminary injunctive relief previously imposed by the Court has expired." Doc. [467]. On March 26, 2019, Plaintiff filed a motion for preliminary injunction, seeking to prevent alleged customer confusion. Doc. [16]. Specifically, the motion requested that the Court enjoin Defendants from:  using the business name "Hoffmann Air Conditioning & Heating"; using terms confusingly similar to "Hoffmann Brothers"; using the "hoffmannairconditioning.com" domain name; representing that their goods or services are associated with Hoffmann Brothers; selling goods or services that are likely to dilute the quality of the Hoffmann Brothers mark; making false representations with respect to the nature or origin of their services; or otherwise infringing on the Hoffmann Brothers mark. Doc. [16] at 3-4. The motion also requested that Defendants recall all materials bearing the Hoffmann Brothers mark and destroy all materials in their possession that infringe or dilute the Hoffmann Brothers mark or otherwise unfairly compete with Hoffmann Brothers. *Id.* at 4.

On November 8, 2019, the parties filed a Joint Submission Regarding Relief Sought in Plaintiff's Motion for Preliminary Injunction (First Joint Agreement). Doc. [149]. In the First

Joint Agreement, the parties stated that they entered into the agreement in order to preserve the Court's and their own resources by resolving all issues related to the preliminary injunction save one. In the First Joint Agreement, Defendants agreed to abide by most of the terms of Plaintiff's motion during the "pendency of the litigation," and agreed that the restrictions imposed in the joint submission would be in effect "until final disposition of this case." *Id.* at 2-4. After the joint submission, only one issue remained: whether Defendants should be required to implement "negative keywords" in their pay-per-click advertising strategies. *Id.* at 2. On December 6, 2019, Plaintiff filed an Amended Motion for Preliminary Injunction, arguing that Defendants should be required to add 'Brothers' and 'Bros' as *negative* keywords in their pay-per-click advertising settings. Docs. [153], [154]. On October 16, 2020—before the Court decided whether to impose the requested injunction—the parties entered into yet another joint submission (Second Joint Agreement), in which Defendants agreed to implement the negative keywords "until final disposition of this case." Doc. [173] at 2. In the Second Joint Agreement, Plaintiff acknowledged "that further proceedings on its Amended Motion for Preliminary Injunction are unnecessary, and Plaintiff hereby withdraws its Amended Motion for Preliminary Injunction. *Id.* at 3. Defendants now seek to be released from the restrictions imposed under the First and Second Joint Agreements.

Defendants assert that the restrictions imposed on them by the First and Second Joint Agreements dissipated upon "final disposition" of the case, which occurred upon entry of judgment by the Court after the jury reached a verdict on all claims. Plaintiff's position is that (1) the First and Second Joint Agreements are not preliminary injunctions, as characterized by Defendants, but instead contracts between the parties; and (2) as evidenced by other agreements entered into during this litigation, the parties' intent was always that "final disposition" included appeals, and as such, the restrictions should remain in place until any appeal is final.

The Court agrees with Plaintiff that the First and Second Joint Agreements are agreements among the parties as opposed to preliminary injunctions entered by the Court. The Court disagrees, however, that other agreements entered into during the course of this lawsuit disclose what the parties' meant by "final disposition" in the First and Second Joint Agreements. For example, in the protective order entered into by the parties on January 5, 2021, the parties state that they will destroy all confidential information obtained during litigation upon "final disposition of the Actions, whether by dismissal, settlement, judgment or appeal." Doc. [181] at

36

3.  But in the consent preliminary injunction entered into on June 28, 2019, the parties agreed on certain restrictions to remain in place "until final disposition . . . not including appeal."  Doc. [87] at 3.  Upon examination of the prior agreements, the Court discerns only that the parties know how to clarify what they mean by "final disposition," and that, during the course of this litigation, they have sometimes intended it to include appeals but not always.

Because the term "final disposition" as used in the First and Second Joint Agreements is susceptible to more than one meaning, the term is ambiguous.  *See Eisenberg v. Redd*, 38 S.W.3d 409, 411 (Mo. banc 2001); *Patterson v. Rough Road Rescue, Inc.*, 529 S.W.3d 887, 894 (Mo. App. 2017) ("An ambiguity arises where there is duplicity, indistinctness or uncertainty in the meaning of the words used in the contract.").  In discerning the meaning of the phrase, the Court is mindful that "[t]he cardinal rule in the interpretation of a contract is to ascertain the intention of the parties and to give effect to that intention" on consideration of the document as a whole. *J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club*, 491 S.W.2d 261, 264 (Mo. banc 1973); *see also McGuire v. Lindsay*, 496 S.W.3d 599, 607 (Mo. Ct. App. 2016) (citing *Storey v. RGIS Inventory Specialists, LLC*, 466 S.W.3d 650, 654 (Mo. Ct. App. 2015)) ("The primary rule in interpreting a contract is to ascertain the parties' intent and give effect to that intent.").  Where a contract term is ambiguous, the Court may consider parol evidence to determine the parties' intent when entering into the agreement.  *See W. Silver Recycling, Inc. v. Nidec Motor Corp.*, 509 F. Supp. 3d 1106, 1111–12 (E.D. Mo. 2020).  Fortunately, though, the Court need not look beyond the four corners of the agreements to discern what the parties' intended by "final disposition" in this context.

In the First Joint Agreement, the parties stated that they had "successfully narrowed the scope of the preliminary injunction dispute to a single issue," and that, because of "Defendants' . . . representation to the Court as recited herein, Plaintiff acknowledges that further proceedings on its Motion for a Preliminary Injunction are unnecessary," except for the one remaining issue related to negative keyword searches.  Doc. [149] at 1, 4.  In the introductory paragraph of the Second Joint Agreement, the parties state that the agreement is meant to resolve the one remaining issue that was the subject of Plaintiff's Amended Motion for Preliminary Injunction.  *See* Doc. [173], citing Doc. [153].  In the fourth paragraph of the Second Joint Agreement, the parties agreed that "further proceedings on [the] Amended Motion for Preliminary Injunction are unnecessary," and Plaintiff withdrew its request for preliminary relief.

37

*Id.* at 3.  The Court interprets those statements as evidence that the parties intended the First and Second Joint Agreements to operate analogously to a preliminary injunction.  Because the purpose of a preliminary injunction is to preserve the status quo until a trial on the merits can be held, the Court concludes that the parties intended that the restrictions imposed on Defendants by the joint submissions would dissolve after a trial on the merits.  *See Ahmad v. City of St. Louis*, 995 F.3d 635, 641 (8th Cir. 2021) ("In most cases, '[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until trial on merits can be held.'") (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)).

For purposes of the First and Second Joint Agreements, then, a "final disposition" has been reached, as the jury, after trial on the merits, found in Defendants' favor, and the Court entered judgment on that determination.  *See* Docs. [460], [463].  Accordingly, Defendants are no longer subject to the restrictions in the First and Second Joint Agreements.

## VII.   Bill of Costs

There are multiple competing motions for bills of costs in this matter.  Plaintiff and Counterclaim Defendants Hoffmann Brothers, Robert Hoffmann, Chris Hoffmann, and Joe Hoffmann claim that they are the prevailing parties, and should therefore be awarded costs.  At the outset of this litigation, each side brought multiple claims against various opposing parties, and both sides prevailed on some claims.  Plaintiff and Counterclaim Defendants argue that if the Court were to tally up all the claims on which they prevailed at the motion to dismiss, summary judgment, and trial stages, they collectively won more claims than Defendants, and should therefore be considered prevailing parties for purposes of the award of costs in this litigation. Defendants on the other hand, argue that they won on the main issue in the case—Plaintiff's trademark infringement claims—and also won the largest jury award,[17] which included punitive damages, and should rightfully be considered the prevailing parties in the matter.

Federal Rule of Civil Procedure 54(d) provides that "[u]nless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed

---

[17] As noted in the Background section, the jury found in favor of Defendants on the prima facie tort claim, awarding them $800 in actual damages and $5,000 in punitive damages.  *See also* Doc. [460] at 5.  And though the jury found in favor of Plaintiff on its claim that Tom had breached the 2011 Settlement Agreement by failing to return or destroy all Hoffmann Brothers materials in his possession, it awarded only nominal damages of $1 to Plaintiff for the breach.  *Id.*

to the prevailing party." Fed. R. Civ. P. 54(d).  Federal statute provides that the following six

expenses are taxable as costs:

> (1) Fees of the clerk and marshal;
> (2) Fees for printed or electronically recorded transcripts necessarily obtained
> for use in the case;
> (3) Fees and disbursements for printing and witnesses;
> (4) Fees for exemplification and the costs of making copies of any materials
> where the copies are necessarily obtained for use in the case;
> (5) Docket fees under section 1923 of this title;
> (6) Compensation of court appointed experts, compensation of interpreters, and
> salaries, fees, expenses, and costs of special interpretation services.

28 U.S.C. §1920.

A district court has broad discretion over awarding costs to a prevailing party. *Blakley v.*

*Schlumberger Technology Corp.*, 648 F.3d 921, 930 (8th Cir. 2011) (citation omitted).  However,

"[f]ederal courts are bound by the limitations set out in section 1920." *168th & Dodge, LP v.*

*Rave Reviews Cinemas, L.L.C.*, 501 F.3d 945, 957 (8th Cir. 2007) (quoting *Brisco-Wade v.*

*Carnahan*, 297 F.3d 781, 782 (8th Cir. 2002)).

"A prevailing party is presumptively entitled to recover all of its [taxable] costs." *Id.*

(quoting *In re Derailment Cases*, 417 F.3d 840, 844 (8th Cir. 2005)).  Indeed, "[c]osts, unlike

attorney's fees, are awarded to a prevailing party as a matter of course, unless the district court

directs otherwise; unusual circumstances need not be present." *Poe v. John Deere Co.*, 695 F.2d

1103, 1108 (8th Cir. 1982) (citation omitted).  "What counts as prevailing for purposes of an

award of costs is a question of law." *Leonard v. Sw. Bell Corp. Disability Income Plan*, 408 F.3d

528, 533 (8th Cir. 2005).  "Where each of the parties has prevailed on one or more of its claims,

defenses or counterclaims, the district court has broad discretion in taxing costs." *Johnson v.*

*Nordstrom–Larpenteur Agency, Inc.,* 623 F.2d 1279, 1282 (8th Cir.1980); *Tanner v. City of*

*Sullivan*, 2013 WL 3287168, at *1 (E.D. Mo. June 28, 2013).

The district court retains discretion to award costs to a party who, though losing on some

claims, substantially prevails in the case as a whole.  *See Hillside Enters. v. Carlisle Corp.,* 69

F.3d 1410, 1416 (8th Cir.1995); *Scientific Holding Co. v. Plessey Inc.,* 510 F.2d 15, 28 (2d Cir.

1974).  "A classic example of a case in which this discretion may appropriately be exercised is

one in which a defendant, though losing on its counterclaims, succeeds in warding off a

plaintiff's predominant claim." *Fluor Corp. v. Zurich Am. Ins. Co.*, 2022 WL 1185177, at *3

(E.D. Mo. Apr. 21, 2022) (citing *Ira Green, Inc. v. Mil. Sales & Serv. Co.*, 775 F.3d 12, 28 (1st Cir. 2014)).

Here, while both sides prevailed on certain claims, Plaintiff's trademark claims were the gravamen of this lengthy litigation, and thus the Court finds that Defendants prevailed on the predominant claims in this matter.  In addition to prevailing on the predominant claims, Defendants also won the larger judgment, which militates in favor of them being deemed the prevailing party for purposes of costs.  *See Hillside*, 69 F.3d at 1416 (when the court finds for more than one adverse party, the party that won the larger judgment is the prevailing party); *Boswell v. Panera Bread Co*., 2016 WL 4415350, at *1-2 (E.D. Mo. Aug. 19, 2016) (party who won a larger judgment should be considered the prevailing party under the rule) (citing *Tanner*, 2013 WL 3287168, at *2).

Finding Defendants to be the prevailing party in this matter, the Court will award costs to Defendants and deny Plaintiff's/Counterclaim Defendants' motions for costs.  Though the Court will award costs to Defendants, it does so with one adjustment to the amount sought.  Plaintiff and Counterclaim Defendants argue, correctly, that Defendants improperly seek $2,801.14 for expenses incurred in using private process servers in this case.  "[T]he Eighth Circuit has held that under 28 U.S.C. § 1920, a party may not recover the costs of using a special process server." *BMO Harris Bank N.A. v. Gorban Transportation, Inc*., 2021 WL 5279571 at *1 (E.D. Mo. Nov. 12, 2021).  The Court will exclude that amount from its award of costs, taxing only $37,418.58 of the $40,219.72 sought by Defendants.  Accordingly, the Court will grant in part and deny in part Defendants' motion.

## CONCLUSION

For the foregoing reasons, the Court denies Plaintiff's Motion for Judgment as a Matter of Law, or alternatively, Motion for New Trial (Doc. [474]), grants Defendants' Motion for Confirmation from the Court Regarding Preliminary Injunctive Relief (Doc. [467]), grants in part and denies in part Defendants' Motion for Bill of Costs (Doc. [490], and denies Plaintiff's and Counterclaim Defendants' Motions for Bills of Costs (Docs. [493], [494], [495]).

Accordingly,

**IT IS HEREBY ORDERED** that Defendants Thomas E. Hoffmann and Hoffmann Air Conditioning & Heating, LLC's Motion for Confirmation from the Court Regarding Preliminary Injunctive Relief (Doc. [467]), is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff Hoffmann Brothers Heating and Air Conditioning, Inc.'s Motion for Judgment as a Matter of Law, or alternatively, Motion for New Trial (Doc. [474]) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants Thomas E. Hoffmann and Hoffmann Air Conditioning & Heating, LLC's Motion for Bill of Costs (Doc. [490] is **GRANTED in part and DENIED in part**.

**IT IS FURTHER ORDERED** that Counter Defendant Chris Hoffmann's Motion for Bill of Costs (Doc. [493] is **DENIED**.

**IT IS FURTHER ORDERED** that Counter Defendant Robert Joseph Hoffmann, Jr.'s Motion for Bill of Costs (Doc. [494] is **DENIED**.

**IT IS FURTHER ORDERED** that Counter Defendant Robert J. Hoffmann's Motion for Bill of Costs (Doc. [495] is **DENIED**.

**IT IS FINALLY ORDERED** that the Clerk of Court shall tax costs in the amount of $37,418.58 against Plaintiff Hoffmann Brothers Heating and Air Conditioning, Inc.

Dated this 29th day of March, 2023.

_____
SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE